IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

| | | |
|---|---|---|
| KAREN TAYLOR, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO.: _____ |
| | § | |
| TASER INTERNATIONAL, INC., | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Karen Taylor, a former Houston Police Department officer, files this suit complaining of and against Defendant Taser International, Inc. and for cause of action would show the Court and Jury the following:

### Nature of the Case

1.      This is a personal injury/DTPA case arising out of serious, life-altering injuries to Houston police officer Karen Taylor that happened because her "protective" Taser gun, which is supposed to empower officers to protect themselves and others without using lethal force against an assailant, failed.  The truly irksome thing is that, even though the City of Houston is paying Taser millions and millions of dollars for this equipment, the number of times that Taser guns have failed officers in Houston, LA, and other cities, is staggering.  Plaintiff sues under all cognizable theories of recovery, including the DTPA, which makes Taser's "deceptive acts and practices" and "unconscionable" conduct actionable.

### Parties

2.      Plaintiff, Karen Taylor ("Plaintiff" or "Taylor"), an individual, is now a resident of Wylie, Collin County, Texas.  At the time of the incident giving rise to this lawsuit, she was serving the citizens of Houston, Texas, as a police officer.

3.      Defendant Taser International, Inc. ("Taser International") is a foreign corporation organized and existing under the laws of the State of Arizona, whose principal office is located at 17800 N. 85th Street, Scottsdale, Maricopa County, Arizona 85255.  Taser is authorized to do business in Texas and, in fact, has a multi-year, multi-million-dollar contract to provide Tasers and other products and services to the Houston Police Department ("HPD").  If necessary, it may be served with process by serving its president, Luke Larson, at that address.

### Jurisdiction and Venue

4.      This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332.  Venue is appropriate in this District under 28 U.S.C. §1391.

### Facts

5.      Taylor's life dream was to become a police officer and in 2008 that dream came true when she graduated from the Houston Police Academy.  For the next eight years, Taylor dedicated her life to HPD and received more than 15 commendations along the way.  She always looked forward to her patrol shift and was proud of her work.

6.      One of the dilemmas that face police officers, particularly in America's urban areas, is how to apprehend suspects of crime in a way that protects the public, that safeguards the officers themselves and, to the maximum extent possible, that avoids the use of lethal force.  Needless to say, having safety equipment that does not make the officer "safe" compounds that dilemma.

### Trust and Betrayal

7.      Taser has capitalized on that issue by designing, manufacturing and marketing a type of "stun gun" commonly called the "Taser."  Its website and other marketing materials tout the Taser as "the most trusted solution" that has been "proven to protect sworn heroes."

8.      The current "state of the art" model is the Taser X2, touted by Taser on its website as an instrument that "incorporates agencies' most requested features such as a **backup shot** and

a warning arc to ensure accuracy and effectiveness." It explains further that the "backup shot removes any need to manually reload and improves safety and performance in the case of a missed shot or clothing disconnect." *See* www.taser.com. Taser further claims that, with the introduction of this model, "the days of the single shot electrical weapon will soon be a thing of the past" and that "the future of **less-lethal** technology has arrived in the form of the Taser X2." *Id.* As we shall see, police officers have a particularly acute need for an adequate "backup shot."

9.     On or about September 4, 2013, Taser entered into a contract with the City of Houston to provide Taser guns and associated training and support, ostensibly to protect Houston's finest "sworn heroes," including, of necessity, Taylor. Although the original contract was supposed to be for $5 million over five years, in fact, to date, Taser has already been paid more than $7 million and still has two years remaining on the contract.

10.     As a member of the Houston police force, Taylor was issued a Taser X2 (also known as a Taser International X2900), serial number X29001CP2, manufactured by Defendant Taser International. She was trained how to use the weapon that is designed and manufactured to temporarily subdue suspects by generating a strong electric charge. Taylor properly maintained and tested her Taser as she was trained to do.

11.     What neither Taser, nor the Houston Police Department told Officer Taylor was that there have been a very high number of failures of Taser guns being used by Houston Police Officers. Indeed, a public information request filed with HPD revealed that since 2011, on more than 450 occasions, Tasers issued to Houston police officers have failed to discharge properly, meaning they missed the target, failed to penetrate, failed to subdue, or failed to produce the proper charge when deployed against suspects. The complete list is attached hereto as Exhibit A. There is no other way to say it: this is a betrayal of the public trust.

12.     Houston is not the only major metropolitan city whose police officers have been let down by their Taser guns.  Exhibit B hereto is an April 1, 2016, news report from the Tribune News Service about an incident in Los Angeles in which a person was fatally shot by a police officer because his Taser gun failed to subdue the suspect.  As it states, "White's killing last year illustrates a troubling weakness with a weapon meant to play a key role in the LAPD's efforts to reduce the number of police shootings: Tasers often don't work."  According to this report, during the last year in Los Angeles, at least eight of 36 people wounded or killed in encounters with the police were shot because the officers' Taser guns failed them.  The report further chronicles that the Taser devices had the desired outcome only 53% of the time.  When confronted with these astounding failure figures, Taser's official response by spokesman Steve Tuttle was that they were simply "disingenuous."

13.     On information and belief, other major metropolitan police departments have experienced similar rates of failure.

14.     The Court and Jury will easily see the dilemma that this poses for police officers. It is somewhat like having a bullet-proof vest that simply does not stop bullets.  What is an officer to do?  If he/she uses lethal force against someone who is involved in a relatively minor crime, then they are excoriated, suspended, investigated, sued, etc.  But, if their safety equipment fails them, what are they to do?  The excessive rate of failure of Taser guns in the City of Houston has put our police officers, the public, and even the arrestees, at greater risk of harm.

### Tragedy in Houston

15.     October 8, 2015 was like most any other day for Taylor.  She was on patrol duty in North Houston when a call came through after noon that a woman was causing a disturbance at a convenience store by drinking beverages and not paying for them.  When Officer Taylor arrived at the store located at 857 W. Tidwell, she encountered Florence Walker, the suspect.

16.    When Officer Taylor arrived at the convenience store, Walker was pacing outside and appeared to be extremely agitated.  Taylor approached Walker and asked her to come over to her patrol car.  Walker originally acted as if she would cooperate but then she became agitated, started swearing at Officer Taylor, and pushing back. When Officer Taylor tried to detain Walker, she ran away.  Taylor caught the suspect and attempted to put her on the ground but the suspect fought back and continued to fight back.  Walker was grabbing Taylor and throwing punches. Taylor hit back and wanted to deploy her Taser but they were fighting so close together, she could not do so.  She then hit Walker hard enough to back her up and was able to deploy her Taser.  She fired and it briefly subdued Walker and she fell to the ground.

17.    One of the things that is well known to Taser and, indeed, incorporated into the design of its stun guns, is that sometimes *multiple* firings are necessary to subdue an assailant. Taser markets its products as being particularly safe because they are designed to enable the officers to fire another shot.  But, in this instance, the backup shot did not work.

18.    After the initial stun charge was delivered, suspect Walker got back up and started coming at Taylor again.  HPD test records indicate that when Walker started attacking Taylor again, Taylor responded by repeatedly firing her Taser at the suspect, more than six times. However, the Taser failed to deliver any charge whatsoever and the suspect was not subdued.

19.    Instead, Walker continued to fight with Taylor, badly injuring the officer including, but not limited to, serious injuries to Taylor's hand and back.  The fighting did not cease until Walker got off of Taylor and ran into the convenience store.  Then back-up police officers arrived and were able to take control of the situation.

20.    Officer Taylor returned to the police station and, as required, tried to file a report. However, in extreme pain, she could barely think straight and just wanted to go home where she could lie down.  Taylor drove herself home, more than an hour from the police station, and when

she exited her vehicle, she immediately collapsed on the ground outside her house.  She was then driven to the hospital emergency room.  She has not worked a day on patrol since the violent attack.

21.     Indeed, she was initially cleared to return to light desk duty in the fall of 2016 but then was told she would soon be "medically separated" from the department.  If that occurred, Taylor would never have been able to work as a police officer ever again and would have only received a very small pension.  Therefore, she was left with no choice but to resign from the police department.  As she wrote in her letter of resignation, "Unfortunately, I am out of time, I am out of money, and I am out of hope.  It is with great sorrow that I must tender my resignation from the Houston Police Department, effective Friday, November 18, 2016."

## Causes of Action

22.     **FIRST:  DTPA**.  The Texas Deceptive Trade Practices - Consumer Protection Act, §17.41, *et. seq.*, TEX. BUS. & COMM. CODE, brands certain conduct as "unlawful" and provides substantial legal remedies for consumers against such unlawful "false, misleading and deceptive business practices" and "unconscionable actions."   §17.44, §17.46, §17.50.  Taylor was a "consumer" as defined by the Act.  §17.45(4) and Defendant Taser's violations of the DTPA, and its breach of legal warranties, were the producing cause of her injuries and damages.

23.     Taser's Unlawful Deceptive Trade Practices.  Taser has represented that its stun gun products have "characteristics, uses, or benefits" which they simply do not, in violation of §17.46(b)(5).  It also portrays the Taser guns as having a "standard, quality or grade" that they do not.  This violates §17.46(b)(7).  On information and belief, it is further alleged that Taser failed to disclose material information about the failure or misfire rates of its stun guns to representatives of the City of Houston, in violation of §17.46(b) (24).

24.     Taser's Unconscionable Conduct.  The DTPA provides that an "unconscionable action or course of action" means an act or practice that "takes advantage of the lack of knowledge,

ability, experience, or capacity of the consumer to a grossly unfair degree." §17.45(5).  Clearly Taser's actions in promoting the Taser stun gun as a "trustworthy" means to protect America's "sworn heroes," like Taylor, fall within this statutory definition.

25.     On information and belief, it is alleged that Taser's statutory delicts were committed "knowingly" and/or "intentionally" as defined by §17.45(9, 13), so as to give rise to actual and enhanced damages pursuant to §17.50(b and h).

26.     Prior to the filing of this suit, Plaintiff provided Defendant Taser with the presuit notice required by §17.505, and offered to permit representatives of Taser to "inspect" (but not *test)* Officer Taylor's Taser device.

27.     **SECOND.  STRICT TORT LIABILITY**.  Taser is strictly liable under the tort theories adopted by the Texas Supreme Court pursuant to Sections 402A and 402B of the Restatement (Second) of Torts, and partially codified in Chapter 82, TEX. CIV. PRAC. & REM CODE. The Taser X2 at issue in this case was unreasonably dangerous or "defective" within the meaning of the products liability jurisprudence of this State, and Taser engaged in material misrepresentations including, *inter alia*, the misrepresentation that this stun gun was a "trustworthy" means to protect America's "sworn heroes".  The defects and misrepresentations were a producing cause of injuries to Taylor and, consequently, Taser is strictly liable for her injuries and damages.

28.     **THIRD: NEGLIGENCE**.  Taser has not acted as a "reasonably prudent person" would do under the "same or similar circumstances," and, thus, is guilty of common law negligence which was a proximate cause of Taylor's injuries and damages.  Indeed, to the contrary, Taser International failed to exercise ordinary and reasonable care in designing, manufacturing, testing, marketing, labeling, packaging, selling, recalling and/or distributing the Taser X2 and negligently failed to provide adequate warnings and instructions to Officer Taylor or distributors, retailers, and

sellers regarding the Taser X2. This conduct constitutes negligence. As a direct and proximate result of this negligence, Officer Taylor has suffered serious bodily injury, mental and physical pain and suffering, and has incurred great economic loss.

29.     **FOURTH:  BREACH OF WARRANTY**. Taser's marketing representations of "trustworthiness" create express warranties under the law. Also, there is a common law and statutory implied warranty of merchantability and of suitability for the "particular purpose" of protecting police officers from harm such as that inflicted by the assailant in this case. Taser's breach of warranties was a proximate cause of Officer Taylor's injuries and damages.

<u>Damages</u>

30.     As a result of the incident made the basis of this lawsuit described in the preceding paragraphs and Taser International's negligence, Officer Taylor sustained significant injuries and damages in the past and will in reasonable probability sustain these damages in the future. Her doctors have recommended back surgery and, obviously, she is extremely devastated about her inability to continue her career as a police officer.

31.     Officer Taylor respectfully requests that the trier of fact determine the amount of her damages and losses she has incurred in the past and will reasonably incur in the future, as well as the monetary value of these damages which include, but are not limited to the following elements:

    a.      Physical pain and mental anguish;
    b.      Lost wages;
    c.      Loss of earning capacity;
    d.      Physical impairment;
    e.      Medical care expenses; and
    f.      Other out-of-pocket economic losses.

32.     The conduct, actions, and omissions of Taser International described in the preceding paragraphs constitute violations of the Texas DTPA and Texas case law and were a

producing/proximate cause of economic and mental anguish damages to Officer Taylor.  Officer Taylor therefore seeks recovery for the economic damages she has suffered.  Further, because DTPA violations were knowingly or intentionally committed, Officer Taylor seeks enhanced statutory damages.  Officer Taylor also seeks recovery of all remedies available under the Texas DTPA including reasonable attorney's fees and costs associated with the prosecution of the claims under the Texas DTPA as allowed by law.

33.     Officer Taylor seeks both prejudgment and post-judgment interest as allowed by law, for all costs of court, and demands judgment for all other relief, both in law and in equity, to which Officer Taylor may be entitled.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Karen Taylor prays that Defendant Taser International, Inc. be cited to appear and answer and that upon final trial and hearing hereof, that Plaintiff recover damages in accordance with the evidence, that Plaintiff recover costs of court herein expended, that Plaintiff recover interest to which Plaintiff is justly entitled under the law, and for such other and further relief, both general and special, both in law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**VICKERY & SHEPHERD, LLP**

*/s/ Arnold Anderson Vickery*
Arnold Anderson Vickery
Texas Bar No. 20571800
Fred H. Shepherd
Texas Bar No. 24033056
10000 Memorial Dr., Suite 750
Houston, TX  77024-3485
Telephone:  713-526-1100
Facsimile:  713-523-5939
Email:  andy@justiceseekers.com
Email:  fred@justiceseekers.com

**Chris Bell P.C.**

*/s/ Chris Bell*
Chris Bell
Texas Bar No. 00783631
10000 Memorial Dr., Suite 750
Houston, TX  77024-3485
Telephone:  713-300-5158
Facsimile:  713-583-5524
Email:  Chris@ChrisBellLaw.com

**The Briscoe Group PLLC**

*/s/ Billy J. Briscoe*
Billy J. Briscoe
Texas Bar No. 24028926
1980 Post Oak Blvd., 15th Floor
Houston, TX  77056
Telephone:  713-752-2600
Facsimile:  832-201-9950
Email:  bbriscoe@thebriscoelawfirm.com

*Attorneys for Plaintiff*