IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

| | | |
|---|---|---|
| KAREN TAYLOR, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO.: 4:17-cv-00673-GHM |
| | § | |
| TASER INTERNATIONAL, INC., | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff Karen Taylor, a former Houston Police Department officer, files this suit complaining of and against Defendant TASER International, Inc., now known as Axon Enterprise, Inc., and for cause of action would show the Court and Jury the following:

### Authority for Filing Amended Complaint

1.      Paragraph 2 of the docket control order, Doc. 15, constitutes court approval, within the meaning of Rule 15, FED. R. CIV. P., to file an Amended Complaint without further stipulation, motion or Order, so long as it is filed on or before July 28, 2017.

### Nature of the Case

2.      This is a personal injury, products liability and DTPA case arising out of career ending injuries to Houston police officer Karen Taylor that happened because her supposedly "protective" TASER X2 stun gun was, by intentional design, too underpowered to stop her assailant with the "high degree of certainty" that TASER founder and CEO Rick Smith has claimed as being "critical" to protect police officers from being harmed by the sometimes violent people they must confront in the day to day work of policing.  This makes the X2 "defectively designed" within the meaning of Texas products liability law.

## Parties

3.      Plaintiff Karen Taylor is now a resident of Wylie, Collin County, Texas.  At the time of the incident giving rise to this lawsuit, she was serving the citizens of Houston, Texas, as a police officer.

4.      Defendant Axon Enterprise, Inc. is a Delaware corporation with principal place of business at 17800 N. 85th Street, Scottsdale, Maricopa County, Arizona 85255.  This corporation was, at the time of the incident giving rise to this case and at the time of the filing of the original Complaint, known as TASER International, Inc.  As noted in footnote 1 of TASER's Answer, Doc. 6, the company "changed its name to Axon Enterprise, Inc." on April 5, 2017, and it has elected to "proceed in this litigation under its *former name*."  TASER International is authorized to do business in Texas and, in fact, on September 4, 2013, the City of Houston approved a multi-year, multi-million-dollar contract to provide TASER X2s and other products and services to the Houston Police Department during a five-year period.  To date, the City of Houston has paid more than $9 million to TASER pursuant to this contract.

## Jurisdiction and Venue

5.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Venue is appropriate in this District under 28 U.S.C. § 1391.

## Facts

This suit has become necessitated by the following facts, laid out with some particularity in light of the twin *Twiqbal* rulings and their progeny and in compliance with defense counsel's request for a more fulsome set of allegations regarding the design defect claims.

## Danger for "America's Heroes"

6.      Policing is a dangerous job.  People who commit crimes are frequently either violent by nature, or, as in this case, have some mental impairment or illness which makes them

unable or unwilling to respond to police authority in a reasonable, non-violent way. The job requires judgment calls about the level of force that is required to disarm or disable a potential assailant. Although most police officers in this country carry firearms, there is a natural desire to avoid using lethal force against an assailant unless it is absolutely necessary, and a corresponding Fourth Amendment obligation not to use "excessive force."

7.    Because of this, one of the dilemmas that police officers, particularly in America's urban areas, regularly face is how to apprehend suspects of crime in a way that protects the public, that safeguards the officers themselves and, to the maximum extent possible, that avoids the use of lethal force.

8.    There is a category of weapons which have been designed and marketed to deal with the police officers' dilemma. Broadly speaking, these are weapons that are designed to emit one or more powerful electrical impulses or "waves" or "pulses" that are supposedly designed to disable and control an assailant. They are commonly called "stun guns" or, more technically, as in TASER's Answer in this case, "Conducted Electrical Weapons" or "CEW" for short.

9.    In September of 1993 two brothers, Rick and Tom Smith, formed a company for the express purpose of developing future non-lethal electronic weapons. The following month, they licensed technology that had been developed by NASA scientist, Jack Cover, who they hired to help them finalize the development of the next generation of such weapons. Through this deal they acquired four things: (i) a "novel" idea, (ii) a catchy name, (iii) a compressed air delivery system that kept the new technology out from under the watchful regulatory eyes of the ATF, and (iv) rights to a weapon in the development stage that turned out to be poorly designed and underpowered. In December of 1994, that weapon, which put out an electrical charge of only 70 microcoulombs, was launched under the name "AIR TASER 34000".

## Tom Swift's Electric Rifle

10.     Cover's novel idea and catchy name both derived from a 1911 book called TOM SWIFT AND HIS ELECTRIC RIFLE.  In this 10th book in the adventure series, the boy adventurer and inventor Tom Swift invents a sci-fi weapon that he calls his "electric rifle."  The gun worked "[b]y means of a concentrated charge of electricity which is shot from the barrel with great force."

11.     Although Tom Swift's gun was designed to kill, and, in fact, was used to slaughter a whale, numerous sharks, an African bull, and many very large, ivory tusked elephants, when Tom used it to rescue two white missionaries from a band of red pygmies, he initially "fired only to *disable*, and not to kill the red pygmies."  His "electric rifle was well adapted for this work, as he could regulate the charge to *merely stun,* no matter at what part of the body it was directed."  *Id.*  This book apparently inspired Jack Cover to conceive of the concept of a gun that would "merely stun."  With the addition of an "**A**", it also gave him the catchy acronym that has become a household word in America.[1]

## TASER's Underpowered 70 Microcoulomb Weapon

12.     The stun gun invented by Jack Cover and licensed to the Smith brothers was the so-called AIR TASER 34000.  It was a 7-watt weapon that put out approximately 70 microcoulombs of charge.  Regarding its ability to incapacitate attackers, TASER CEO Rick Smith has written quite bluntly that it simply "Did Not Get the Job Done!"  Exhibit C, Expert Report of Patrick (Rick) W. Smith at 23/40, in *Mann v. TASER International, Inc.*, Case No. 4:05-cv-00273 (Sept. 14, 2007) [hereinafter "Smith Expert Report].  He explained that the "key

---

[1]  As noted in TASER's answer, its corporate name is an acronym.  The intrepid inventor Tom Swift had no middle name or initial.  The "A" was appropriated by Jack Cover when he created the acronym, presumably so that the corporate name would sound like "Laser" instead of "Teaser."

indicator for safety and effectiveness" is the amount of current delivered during a period of time, also known as the "***charge.***" *Id.* at 6, 11/40.  And the 70 microcoulomb charge of the AIR TASER, "was found to be *insufficient* to cause any motor neuron mediated stimulation of muscle," or to use TASER's later nomenclature, "neuromuscular incapacitation" [NMI].  *Id* at 33/40.

13.    The Smith Expert Report chronicles the experience that lead him to these conclusions.  It was a trial run of the AIR TASER in Czechoslovakia in which "several volunteers . . . were all able to overcome the (pain compliance) effects of the AIR TASER 34000." *Id.* at 23/40.  Following this "debacle", Rick Smith realized the company had to design "a device that would not only involve discomfort, but also **interfere with voluntary muscle control.**" *Id.* at 24/40.  He branded the AIR TASER as a mere "stun gun" whose "effects may psychologically stun the subject, but they did not cause involuntary incapacitation." *Id.*

### Mr. Smith's Monopoly

14.    Rick Smith's experience with this early "stun gun" technology lead him to an important discovery, which he set out as follows in numerous patents, including the one that gives TASER a monopoly on the two shot X2 weapon:

> I have discovered that an individual can be readily trained to walk through 0.01 to 0.5 joule pulses delivered by a conventional dart weapon. . .. It appears that conventional dart weapons cause an individual to fall down by activating sensory neurons and by producing in an individual a psychological reaction which strongly suggests to the individual that he or she is being incapacitated. The discovery that an individual can overcome a conventional dart weapon and continue his or her locomotion suggests possible *dire consequences* because many police officers in possession of conventional dart weapons mistakenly assume that they are effective against *most or many individuals.*

> Accordingly, it would be highly desirable to provide an improved apparatus and method which would with a ***high degree of certainty*** enable a police officer or other individual to incapacitate an attacker.

US Patent 7,158,362 covering "Less lethal weapons for multiple shots" (January 2, 2007) (Inventor, Patrick Smith; Assignee TASER International, Inc.), attached hereto as Exhibit D and incorporated herein by reference.

15.     With these words explaining the background of his invention, Mr. Smith and TASER extended their 17-year monopoly on a new "hand-held stun gun for *incapacitating a human target*" that he had obtained using similar verbiage in his 2003 U.S. Patent No. 6,636,412.  In discussing the most important aspects of his invention in both of these patents, Smith further noted that "it is ***critical*** to produce contractions of skeletal muscles sufficient to prevent the voluntary use of the muscles for normal locomotion of an individual's body. ... (*i.e.*, the muscles must lock up and not be operable."  **"Control"** via neuromuscular incapacitation was "critical."  Achieving voluntary "**compliance**" from the subject via pain would not provide adequate protection for the officers.

16.     Smith did not leave the potential "dire consequences" of using under-powered stun guns to the speculation or imagination of Patent Examiner Carone.  Rather he spelled it out in plain English under the category "FIELD OF INVENTION":

> This invention relates to apparatus and methods for *preventing the* locomotion of a human being or animal.  More particularly, the invention relates to apparatus and methods for assuring, with a ***high degree of certainty,*** that a police officer or other law enforcement agent can *prevent an* attacker or other violent individual from ***reaching and inflicting bodily harm on the police officer."***

### Stopping Power

17.     As described in the Smith Expert Report, *supra,* under the leadership of the Smith Brothers, TASER International designed and marketed a 26-watt CEW which it branded as the "M26". This weapon was released in 1999. TASER ramped up the power to approximately 4x that of the AIR TASER and increased the total charge by something in the range of 3x. Thus, the M26 delivered a whopping "182 microcoulombs total rectified charge". Smith Expert Report at 33/40.

18.     The M26 delivered on Smith's patent promise of a weapon that would "incapacitate" an attacker with a "high degree of certainty." But it was large, unwieldy, and a battery hog. Therefore, in May of 2003 TASER introduced its next generation weapon, the X26. According to Rick Smith, it used a "new waveform" with "Shaped Pulse Technology" and "delivered a comparable amount of charge to the waveform from the TASER M26." *Id.* The X26, was released in 2003 and it is responsible for the enormous commercial success of TASER in this country and internationally.

19.     Thus, both the M26 and the X26 were designed to have the enormous "stopping power" that Mr. Smith's patent claimed was "critical" for his invention. But there is no generally accepted standard or barometer within the field of electro-physiology to objectively measure "stopping power" and TASER has used various terms at various times to describe it. Claim 1 of the seminal patent uses the phrase a "powerful electrical output pulses" and then quantifies the goal as something in the range of 0.9 to 10 joules. Claim 3 focuses on the duration of the electrical pulse, specified as being "from 10 microseconds to 100 microseconds." As noted above, Mr. Smith has spoken colloquially of the wattage of the various weapons. He has also bragged to police audiences that his products put out "50,000 volts".

20.     But, when writing specifically on the topic of "stopping power" Mr. Smith has focused on the output in terms of a "charge," as measured in terms of "**microcoulombs**."  The "stopping power" of the Air TASER was rated at 70 microcoulombs, and branded by Mr. Smith as being "insufficient."  By contrast, the "stopping power" of the X2 weapon at issue in this lawsuit is only 63 microcoulombs, (plus or minus 9).  And, in actuality, the testing performed by TASER's expert, Gray's Engineering on Officer Taylor's X2 weapon reflects an even lower output.

21.     Of all the terms employed by TASER during the years to describe the "stopping power" of its weapons, perhaps the most intriguing is "muscle disruption units [MDU]," which appears to be a marketing term coined by Rick Smith himself to persuade police officers and departments that the X26, released in 2003, had comparable "stopping power" to the M26.  Basically, it is a measure of muscle contraction on anesthetized pigs.  By TASER's own reporting, the M26 put out 100 MDU's, and the X26 put out 105 MDU's.  This testing and measurement is the basis for Mr. Smith's claim on 34/40 of the Smith Expert Report that the X26 was "designed to cause 5% stronger muscle contractions than the M26."

22.     To put this comparison into perspective, the old, inadequate, 7-watt Air TASER 340000, was rated only 20 MDU's.  Depositions in this case have confirmed that TASER has the laboratory data to provide the Court with information about the MDU's of the X2, even if they have not yet calculated them.  Plaintiff will seek such information.  Meanwhile, on information and belief, it is alleged that, the 63 (+/- 9) microcoulomb X2 weapon at issue in this case has even less than the 20 "muscle disruption units" than the inadequate, underpowered 70 microcoulomb AIR TASER.

## The Heart of the Matter -- Potential Cardiac Lethality

23.     As the above sequence of events illustrates, the TASER X26 was an enormous commercial success.  However, by 2006 to 2009, there was trouble in Scottsdale.  The entire premise of the first two generations of TASER weapons was that they would enable a police officer to stop and control an assailant with *non-lethal* force.  TASER boastfully claimed that its weapons posed absolutely no risk of cardiac or other permanent damage to the person being "tased."

24.     But as people began to die, TASER's claims came under more scrutiny.  In 2006 a scientist that had been hired by TASER to do some studies on the effects of TASER stun guns on a pig's heart reported that these weapons could trigger "cardiac capture" or cause "ventricular fibrillation."  TASER did nothing in response.

25.     By 2008, almost 300 people in North America had died immediately after being "tased."  Even Tom Smith conceded that the scientific evidence implicated TASER as a "contributing factor" in at least 30 of these deaths.  But in a video interview in the public domain his brother, Rick boldly claimed there was "absolutely no basis" to blame TASER, and that in "every single case, these people would have died anyway."

26.     Not surprisingly, some of these deaths spawned civil lawsuits and/or regulatory scrutiny.  TASER's litigation strategy (which it has already reprised in part in this case) was two-fold: (a) deny until the cows came home that the TASER weapons would cause cardiac damage to anyone, and (b) blame the police officers for the way in which they used these weapons.

27.     Most of the lawsuits came from people who were "tased".  Not surprisingly, TASER prevailed in a large majority of them.  However, one of these lawsuits was filed on behalf of the parents of a 17-year old boy who died on March 20, 2008, from a cardiac arrest after "being hit in the chest with a TASER Model X26 electrical control device."  Order of U.S.

District Court in *Turner v. TASER International, Inc.,* Case No. 3:10-cv-00125-RJC-DCK (W.D.N.C. March 27, 2012).

28.    The recitation of facts in the *Turner* court's order are hauntingly like what happened in this case, although the person who was hurt was the assailant and not the police officer that the TASER has ostensibly been designed and marketed to protect.   Young Mr. Turner was a bagger-cashier in a Food Lion supermarket, but he was accused of stealing food from the store.   He became "defiant and confrontational."   Police Officer Jerry Dawson attempted to "incapacitate the attacker" by firing the TASER X26 for 37 seconds.   For most of that time, Mr. Turner seemed to "walk through" the electrical charge.  *Id.* at 3/35.

29.    The *Turner* case was filed on March 16, 2010, and claimed that TASER was negligent, and its X26 was dangerous, because its electrical charge could, particularly if fired "center mass" as TASER's training urged officers to do, capture the cardiac rhythms of the person being "tased".   Competent expert testimony supported both the liability and causation claims.  *Id.*   On July 19, 2011, the jury in that case awarded a $10 million verdict against TASER.   The trial judge subsequently remitted the verdict to $5,037,399, and further reduced the judgment to $4,372,399 because of pretrial settlements with other defendants.  *Id.*   The Fourth Circuit ultimately affirmed the liability findings, but ordered a new trial on damages, and the case was settled thereafter.  *See Fontenot v. TASER Int'l, Inc.*, 736 F.3d 318, 333 (4th Cir. 2013).

30.    Meanwhile, the death of a Polish immigrant to Canada spawned an investigatory commission there headed by Judge Braidwood.   After hearing substantial evidence, he, like the jury in the *Turner* case found that there was, indeed, a risk of ventricular fibrillation.   TASER appealed the commission's decision, but lost its appeal.   After this finding, TASER use in British Columbia plummeted by approximately 87%.

31.     Still another tragic death in Warren, Michigan, lead to a lawsuit and, thereafter, to a decision by that municipality to stop arming its officers with these potentially lethal weapons.

### TASER's New Underpowered 63 Microcoulomb X2 Weapon

32.     From 1999 until the cardiac imbroglio hit with full power, the principal focus of TASER's R&D was in developing, measuring, and proving that its weapons had the "stopping power" to protect officers.  By 2009 that had changed.  Although the actual civil litigation risks seemed to be fairly minimal, the adverse publicity, and the specter of losing out on lucrative government contracts, prompted TASER to change its R&D focus quite radically.  From 2009 on, TASER's #1 priority seems to be "stopping lawsuits."  Toward that end, when it released the X2 in 2011, it deliberately designed a weapon that only had 63 microcoulombs (+/- 9) of "stopping power."

33.     Although it frankly does not matter *why* TASER International opted to reduce the power output in the X2 device, it certainly *seems* like it was done to deflect criticism and avoid legal liability and public scrutiny about cardiac injuries.

34.     The *Turner* plaintiffs' son was killed in 2008.  By the end of 2009 TASER released its X3, three-shot weapon.  This weapon utilized circuitry designed by Max Nerheim in TASER's "OSLO Project."  It was a commercial flop.

35.     The *Turner* verdict was rendered on July 19, 2011, and the Court's Judgment was entered on March 27, 2012.  During the pendency of the *Turner* lawsuit, approximately three months before the trial and verdict, in April of 2011 TASER unveiled the supposedly new, improved, and "state of the art" Model X2 at issue in *this* lawsuit.  It, too, uses the same OSLO circuitry employed in the X3 and, as noted above, its "stopping power" is a mere 63 microcoulombs (+/-9).

36.     The X2 may be *less lethal* to the assailant than the X26 model at issue in the *Turner* case because, in its design of this weapon, TASER *lowered* the juice output to only 63 microcoulombs (plus or minus 9).  This reduction in electrical output arguably makes the gun "less lethal" and therefore "safer" for the assailant.  Conversely, however, it definitely makes it far more dangerous for the police officer.

### A "High Degree of" UNcertainty

37.     TASER has capitalized on its name and brand recognition and has persuaded numerous cities and other governmental entities to buy its supposedly new "state of the art" X2 weapon.  Indeed, because of its monopoly position and its decision to stop production of the X26 in December 2014, the governmental entities have no other viable choice of a CEW weapon.  But it has purposefully withheld from those entities the fact that, in designing this new weapon, it changed its focus from "stopping power" for assailants to "stopping lawsuits" and it had lowered the electrical charge to only 63 microcoulombs.

38.     As a result, the cities are undoubtedly befuddled when their new "state of the art" TASERs do not seem to work as well as the old, tried and true X26s.  Exhibits A and B to Plaintiff's Complaint, Doc. 1 at ¶¶ 11-12, reattached hereto and incorporated herein by reference, establish that since the 2011 introduction of the X2 in Houston, TASERs have failed Houston police officers on 450 occasions, and a study done in Los Angeles reveals a 2015 failure rate of 47% of these "state of the art" devices.  Other cities, like Cincinnati and Las Vegas have also experienced enormous problems with the X2.

### Officer Karen Taylor's Career-Ending Injuries

39.     Karen Taylor's life dream was to become a police officer and in 2008 that dream came true when she graduated from the Houston Police Academy.  For the next eight years, Taylor dedicated her life to HPD and received more than 15 commendations along the way.

Two of her fellow officers have already given depositions in this case that attest to her devotion to, and competence in, her job.  Karen Taylor always looked forward to her patrol shift and was proud of her work.

40.    As a member of the Houston police force, Taylor was issued a TASER X2 serial number X29001CP2, manufactured by Defendant TASER International.  She was trained how to use the weapon which is designed and manufactured to temporarily subdue suspects by generating a strong electric charge.  Taylor properly maintained and tested her TASER as she was trained to do.

41.    Like law enforcement professionals across America, Taylor trusted this TASER stun gun, and the integrity of the company that sells this device for her own protection, as well as that of the Houston citizenry, to include suspects that she had to arrest.

42.    What she was *not* told was that this generation of TASER stun gun devices had been modified to reduce the electrical output so that it was safer for her assailants, but more dangerous for her.  Nor was she warned or instructed that it should not be used on mentally ill patients.  To the contrary, in all of her training on TASER and in her CIT training on how to deal with mentally troubled individuals, she was told that the TASER gun would cause the same kind of "neuromuscular incapacitation" as it was touted to do on other people.

43.    October 8, 2015 was like most any other day for Taylor.  She was on patrol duty in North Houston when a call came through after noon that a woman was causing a disturbance at a convenience store by drinking beverages and not paying for them.  The store owner had asked the woman repeatedly to leave, but she refused to do so.  A man named Raymond Davis suggested that the store manager call the police for help, and he did.  Officer Karen Taylor responded to that call.

44.     When Officer Taylor arrived at the store located at 857 W. Tidwell, she encountered Florence Walker, the suspect.  Walker was pacing outside the store and appeared to be extremely agitated.  Taylor approached Walker cautiously and reasonably and tried to steer her towards the patrol car.  She also tried to gain "control" over Ms. Walker without the use of any force.

45.     But Florence Walker was not to be controlled that day.  She was a mentally ill person in the midst of florid psychosis.  She was hearing voices and thought that she was God. She attacked Officer Taylor and at one point screamed that she was going to "kill her."  Taylor had initially requested routine back-up assistance.  But, until the back-up arrived, Karen Taylor was on her own with a person who now had become suddenly violent and uncontrollable.

46.     At one point during their fight, Officer Taylor hit Ms. Walker hard enough to move her back and provide enough room for her to fire her TASER.  The first knocked Walker down, but, according to an eyewitness account, verified by Police Officer Darrell Williams' report and deposition testimony, "after the woman was tased she fell and hit her head but *almost immediately* jumped up."  Officer Taylor fired a second cartridge from within five feet.  This shot had "no effect" on Ms. Walker.

47.     A final, desperate point blank "drive stun" was attempted, with zero success.  This is not particularly surprising.  The "drive stun" mode is a mere "pain compliance" tool and is frequently inadequate with mentally ill people.

48.     To determine exactly how many shots were fired, and in what sequence, the parties to this proceeding entered into a Stipulation and asked the Court for an Order permitting the X2 weapon to be tested by experts.  TASER chose Gray's Engineering & Consulting to do the testing in its behalf.  Gray's Test Report 17TR2093A, dated July 12, 2017, is attached hereto

-14-

as Exhibit E and incorporated herein by reference.  On page 17 of 19 it confirms that, on October 8, 2015, Karen Taylor pulled the trigger three times.

49.     The first trigger pull was at 17:46:00.  The darts clearly made good contact, because the Gray's report documents that the gun put out 60 microcoulombs of consistent charge during a 5 second period.  The second cartridge was fired six seconds later, at 17:46:06.  Gray's graph of the pulse shows that the charge varied back and forth during the 5 second period, and averaged only 48 microcoulombs.  This is a strong indication that Ms. Walker was doing the same thing that Rick Smith had experienced in Czechoslovakia, *i.e.,* "walking through" the meager charge from the underpowered X2.

50.     The third trigger pull was only 8 seconds after that, at 17:46:14.  Because there were no more darts to shoot, it was a mere "stun drive" attempt.  The 6 microcoulomb output from this shot was obviously not enough to do anything to Ms. Walker, except, perhaps, to further enrage her.

51.     Approximately four to five minutes after the three TASER trigger pulls, Officer Karen Taylor was in a fight for her life.  A woman claiming to be "God" was threatening to kill her, biting her, and fighting her with "superhuman" strength.  Karen hit the emergency panic button and called for immediate "officer needs assistance" backup.  Almost 20 different officers arrived with lights flashing and sirens blaring.

52.     When the cavalry arrived, it took three strong male officers to subdue Ms. Walker, and even then, she tried to bite them and had to be restrained with leg restraints and a "Hannibal the Cannibal" face mask.  Although Ms. Walker had assaulted police officers, the DA refused charges because of Ms. Walker's mental status, and she was thereafter involuntarily committed.

53.     After the TASER failed to stop Florence Walker, she continued with her vicious attack on Officer Karen Taylor which resulted in serious, permanent, disabling and career ending injuries to her back.

**Foreseeable Consequences**

54.     Although the foreseeability component of proximate causation is not part of the "producing cause" standard under strict products liability and the DTPA, it is significant that what happened in this case is precisely what Rick Smith *predicted* would happen if police officers were provided with an underpowered weapon.

55.     As noted above, in his patent for the multiple shot X2 device, Mr. Smith explains that his invention "relates to apparatus and methods for assuring, with a *high degree of certainty,* that a police officer or other law enforcement agent can prevent an attacker or *other violent individual* from reaching and **inflicting bodily harm <u>on the police officer</u>***."*  He goes on to explain that, because an underpowered weapon still "stopped most individuals, and because the weapon when used appeared to 'knock down' an individual . . .  it was assumed that the human being or animal was *truly physically incapacitated,"* when, in fact, they were not.  *Id.*

56.     On October 8, 2005, Mr. Smith's prophecy came true in Houston, Texas.  The first shot from Karen Taylor's weapon appeared to have "knocked down" Florence Walker, but as the events that unfolded demonstrate, she was far from being "truly physically incapacitated." She "walked through" the second shot and continued to "inflict bodily harm on the police officer."

57.     Mr. Smith's prediction provides the kind of subjective awareness of danger to police officers that, when coupled with the deliberate, designed under-powering of the X2, justifies a finding of "conscious indifference" and warrants the imposition of statutory penalty or exemplary damages.

-16-

## Causes of Action

The foregoing paragraphs are hereby restated in and incorporated herein by reference.  These alleged facts support the following, somewhat overlapping, legal causes of action.

58.   **FIRST: NEGLIGENCE**.  The focus of a negligence cause of action under the Texas common law is on the conduct of the product manufacturer itself.  The test is whether that manufacturer acted as a "reasonably prudent person" would do under the "same or similar circumstances."  Negligence is, by its nature, almost a Jury question.

59.   TASER has *not* acted as a reasonably prudent person would or should under the same or similar circumstances.  It has laid claim to a legal monopoly, and charged the City of Houston and other governmental entities monopoly prices for a "stun gun" that was supposed to be able to "incapacitate" any person who was attacking a police officer or citizen by means of single, non-lethal shot containing a "powerful electrical output" that was sufficiently strong that it would "produce contractions of skeletal muscles sufficient to prevent the voluntary use of the muscles" and would *not* depend on "pain control".  But it has delivered an underpowered, inadequate weapon.

60.    TASER has also been negligent in the warnings and information that it provided to police officers.  Specifically, what the warnings and instructions, and User Manual, do NOT tell police officers, is that when it redesigned the X2, TASER reduced the patent promised "powerful electrical output" so as to reduce the risk of cardiac ventricular fibrillation for the assailants being "tased."  It also made affirmative representations about the ability of the X2 to stop assailants via "neuromuscular incapacitation" and it failed to warn police officers that it had reduced the charge in the X2 and/or that this supposedly new, improved, "state of the art" stun gun would not work on mentally impaired assailants.

61.     TASER's conduct and misconduct, as recited herein, clearly constitutes negligence, and, as noted above, the foreseeability component of proximate causation is established in Rick Smith's own words.   As a direct and proximate result of TASER's negligence, Officer Taylor has suffered serious bodily injury, mental and physical pain and suffering, and has incurred great economic loss.

62.     **SECOND: STRICT TORT LIABILITY**.  TASER International is strictly liable under the tort theories adopted by the Texas Supreme Court pursuant to Sections 402A and 402B of the RESTATEMENT (SECOND) OF TORTS, and partially codified in Chapter 82, TEX. CIV. PRAC. & REM CODE.  The focus of this legal theory is on the product, not its manufacturer.  The TASER X2 at issue in this case was unreasonably dangerous or "defective" within the meaning of the products liability jurisprudence of this State, and TASER engaged in material misrepresentations including, *inter alia*, the misrepresentation that this stun gun was a "trustworthy" means to protect America's "sworn heroes", that it was able to measure output, that no additional equipment or procedures were necessary to measure output, and that it would "incapacitate" an assailant with a "high degree of certainty."  TASER's marketing materials have parroted these patent claims.

63.     The Texas Products Liability Act, Chapter 82, TEX. CIV. PRAC. & REM CODE, does not define "design defect."  However, the general litmus test, embodied in the Texas Pattern Jury Instructions, is whether the product is "unreasonably dangerous."

> A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.

Tex. PJC § 71.4B.  The focus of the "unreasonably dangerous" inquiry in this case is on the consumer/police officer, and ***not*** on the potential dangers to the person being "tased."

64.     Under the Texas common law, product defects generally fall into one of three categories: (a) design defects, (b) manufacturing defects, and/or (c) marketing defects.   The TASER X2 is clearly defective as designed and marketed.

65.      As noted in Plaintiff's Court-directed supplementation of her response to Defendant's "contention" interrogatory in this case, Exhibit F attached hereto and incorporated herein by reference, the design defect "theory" is quite simple.  The X2 is underpowered.

66.     There are generally two, alternative tests, for a design defect.  The first is the so-called "consumer expectations" test.  Obviously, the City of Houston and its police officers like Karen Taylor have a legitimate and reasonable right to expect a device that would incapacitate the vast majority of assailants, including those who are mentally impaired, in the very manner and degree that Mr. Smith claimed for his invention in the various patents.  They had a right to expect a weapon that would disable attackers with a "high degree of certainty."   *See, e.g.,* deposition testimony of Officer Taylor's supervisor, SGT Reyes, in this case.   What they received instead, was an underpowered device that TASER's own pleadings admit is not efficacious in stopping mentally impaired people, like Ms. Walker, and which, according to the statistics quoted herein, has a whoppingly high failure rate.  Thus, under this test, the X2 is defectively designed.

67.     The second test is the so-called "social utility" or "risk/benefit balancing" test.  As the Texas Supreme Court recently wrote, "A product is unreasonably dangerous when its risk outweighs its utility."[2]  In applying this test, the Jury is entitled to weigh the risks inherent in the product, the dangers of using the product, and the cost of same.  Admittedly, IF the TASER X2 delivered on Mr. Smith's patent promises, *i.e.*, IF it would stop almost any assailant, including a

---

[2]  *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 6 (Tex. 2015), citing *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

mentally ill person, with a "high degree of certainty" and in a non-lethal manner, THEN it would have great social benefit and utility.  Perhaps even enough to justify the monopoly prices.

68.    However, for the reasons set forth at length, *supra,* the X2 fails miserably on this test.  It an extremely expensive weapon that does *not* stop attackers with a "high degree of certainty" at all, and, if TASER's Answer is to be believed, it will not stop most mentally impaired attackers.  Moreover, officers are told that they should not aim the device at the easiest to hit part of their attacker, *i.e.*, their central mass/heart area, because, to do so, might result in the administration of lethal force.

69.    Section 82.005 of the Texas Products Liability Act, requires a plaintiff to prove that there is or was a "safer alternative design."  This is an easy burden in this case.  The device claimed in Mr. Smith's seminal patent was a safer alternative design.  And, IF the original TASER model X26 and/or M26 produced a sufficient "powerful electrical output" to disable mentally impaired attackers like Ms. Walker via neuromuscular impairment, with a "high degree of certainty," then those, too, were alternative designs that were *much safer* for police officers than the X2.

70.    But discovery in this case has unearthed yet another "safer alternative design" that, once again, has been designed, manufactured and marketed by TASER itself.  On January 19, 2016, TASER put out a press release on a new weapon designed for use by untrained *consumers.*  Exhibit G, incorporated herein by reference.  Although this weapon uses the same OSLO circuitry as the X2 at issue in this case, according to the deposition testimony of 30(b)(6) designee Mike Gish, it has been modified via "firmware" to put out a 90 microcoulomb charge. The weapon is called the TASER Pulse.

71.    TASER's press release touts the "stopping power" of this 90 microcoulomb weapon.  In it Rick Smith is quoted as saying it "packs the same knock-down punch that has

become the standard for law enforcement around the world."  His VP of Weapons Strategy, Mike Gish echoed that "Despite an introductory price as low as $399, we haven't sacrificed the effective knock down power."

72.     The "Features" section of the press release further claims that this consumer weapon has the "same knock-down power as used by more than 18,000 law enforcement agencies in 107 countries."  Presumably, that does not include Houston, Texas, that has spent more than $9 million equipping police officer with a 63 microcoulomb weapon that, by simple math, has only 70% of the designed "stopping power" of the consumer weapon.

73.     Mike Gish's deposition testimony about the Pulse in this case also illustrates just how easy it would be for TASER to implement a "safer alternative design" for HPD officers.  A simple modification of the "firmware" on the Houston weapons should do the trick.

74.     The TASER X2 is also defective as marketed, because of the affirmative misrepresentations, and the misleading omissions set forth in some detail, *supra.*

75.     Finally, because Texas has adopted Section 402B of the RESTATEMENT (SECOND) OF TORTS, and is likely to adopt its successor, § 6 of the RESTATEMENT (THIRD), Defendant TASER is strictly liable for the misrepresentations detailed in this Amended Complaint.

76.     These defects and misrepresentations were a producing cause of injuries to Officer Karen Taylor and, consequently, TASER is strictly liable for her injuries and damages.

77.     **THIRD: BREACH OF WARRANTY**.  Products liability law in Texas, as in other common law jurisdictions, generally developed from principles of warranty.  These theories are still viable under the law, and, indeed, are included in the statutory definition of "products liability action" under the Texas Products Liability Act.  § 82.001(2), TEX. CIV. PRAC. & REM CODE.  The warranty theory is usually submitted to a Jury under an instruction describing and defining "defect."  *See, e.g.*, Tex. PJC § 71.9.

78.     TASER's marketing representations of "trustworthiness" and the affirmative representations of mode of operations and effectiveness made in the X2 User Manual, as quoted above, all create express warranties under the law.  Also, there is a common law and statutory implied warranty of merchantability and of suitability for the "particular purpose" of protecting police officers from harm such as that inflicted by the assailant in this case.  TASER's breach of warranties was a proximate cause of Officer Taylor's injuries and damages.  These breaches are independently actionable, and, as noted below, are also legally cognizable under the DTPA.

79.     **FOURTH: DTPA**.  The Texas Deceptive Trade Practices - Consumer Protection Act, § 17.41, *et. seq.*, TEX. BUS. & COMM. CODE, brands certain conduct as "unlawful" and provides substantial legal remedies for consumers against such unlawful "false, misleading and deceptive business practices" and "unconscionable actions."  §§ 17.44, 17.46, and 17.50.  As one who acquired both product and services by "purchase or lease," Officer Karen Taylor was a "consumer" as defined by the Act.  § 17.45(4) and Defendant TASER's violations of the DTPA, and its breach of legal warranties, were the producing cause of her injuries and damages.

80.     TASER's Unlawful Deceptive Trade Practices.  For the reasons set forth at great length herein, TASER has represented that its stun guns, and particularly the X2 model, is a smart, "state of the art" weapon that will disable assailants (without limitation regarding mentally ill persons) via powerful electrical impulses that create a neuromuscular impairment, and that it will do so with a "high degree of certainty."  These are false, deceptive and misleading representations (a) that its stun gun products have "characteristics, uses, or benefits" which they simply do not, in violation of § 17.46(b)(5), and/or that the TASER guns are designed and manufactured to a "standard, quality or grade" that they are not, in violation of § 17.46(b)(7).  On information and belief, it is further alleged that TASER failed to disclose material

information about the failure or misfire rates and patterns of same to representatives of the City of Houston, in violation of § 17.46(b) (24).

81. <u>TASER's Unconscionable Conduct</u>. The DTPA provides that an "unconscionable action or course of action" means an act or practice that "takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." § 17.45(5). The Houston Police Department and its officers, like Officer Karen Taylor, only know what TASER tells them about the design and performance characteristics of its weapons. They are told that these are sophisticated weapons that have a reasonably constant, effective, and reliable electrical output that should disable most assailants, when the truth is that even TASER does not know how to measure the output of its weapons. They are also told that there is no need to test or calibrate the output, whereas the truth is that the output varies significantly and there is an enormous need for such testing, and commercially viable products and means to do so. They are also told that these weapons disable assailants via neuromuscular incapacitation. But they have NOT been told that the electrical output was lowered in the new, ostensibly "state of the art" weapon so as to protect assailant from ventricular fibrillation, to "stop bullets" and, correspondingly, to place police officers at greater danger. Nor were they told that TASER could, and in fact *did,* tweak the charge output by a simple "firmware" modification of the device so that, at minimum, they could have the same "stopping power" on their hips that anyone – including bad guys – who purchase the TASER Pulse can buy. This is "unconscionable," both in the vernacular, and within the meaning of the DTPA.

82. Clearly, TASER's statutory delicts were committed "knowingly" and/or "intentionally" as defined by § 17.45(9, 13), so as to give rise to actual and enhanced damages pursuant to § 17.50(b and h).

83.     Prior to the filing of this suit, Plaintiff provided Defendant TASER with the presuit notice required by § 17.505, and offered to permit representatives of TASER to "inspect" (but not *test)* Officer Taylor's TASER device.  Plaintiff's counsel also met with in-house counsel for TASER to discuss the specifics of the allegations, etc.  Therefore, all presuit requirements for a claim under the DTPA have been satisfied.

### Damages and Remedies

84.     Officer Karen Taylor has not worked a day on patrol since the violent attack.  She was initially cleared to return to light desk duty in the fall of 2016 but then was told she would soon be "medically separated" from the department.  If that occurred, Taylor would never have been able to work as a police officer ever again and would have only received a very small pension.  Therefore, she was left with no choice but to resign from the police department.  As she wrote in her letter of resignation, "Unfortunately, I am out of time, I am out of money, and I am out of hope.  It is with great sorrow that I must tender my resignation from the Houston Police Department, effective Friday, November 18, 2016."

85.     As a result of the incident made the basis of this lawsuit described in the preceding paragraphs and TASER International's negligence, Officer Taylor sustained significant injuries and damages in the past and will in reasonable probability sustain these damages in the future.  Her doctors have recommended back surgery (which the workers compensation carrier has yet to approve) and, obviously, she is extremely devastated about her inability to continue her career as a police officer.

86.     Accordingly, Officer Taylor respectfully requests that the trier of fact determine the amount of her damages and losses she has incurred in the past and will reasonably incur in the future, as well as the monetary value of these damages which include, but are not limited to the following elements:

a.   Physical pain and mental anguish;
b.   Lost wages;
c.   Loss of earning capacity;
d.   Physical impairment;
e.   Medical care expenses; and
f.   Other out-of-pocket economic losses.

The monetary amount of the *ad damnum* is in the millions of dollars, and will be particularized on request.

87.   The conduct, actions, and omissions of TASER International described in the preceding paragraphs constitute violations of the Texas DTPA and Texas case law and were a producing/proximate cause of economic and mental anguish damages to Officer Taylor.  Officer Taylor therefore seeks recovery for the economic damages she has suffered.  Further, because DTPA violations were knowingly or intentionally committed, Officer Taylor seeks enhanced statutory damages and mental anguish damages.  Officer Taylor also seeks recovery of all remedies available under the Texas DTPA including reasonable attorney's fees and costs associated with the prosecution of the claims under the Texas DTPA as allowed by law.

88.   TASER's delicts also constitute clear and convincing evidence of either fraud and/or gross negligence within the ambit of §§ 41.001 and 41.003, Tex. Civ. Prac. & Rem Code.  Therefore, upon a Jury finding of same, exemplary or punitive damages may be imposed, as an alternative to DTPA enhanced damages, as set forth above.  In light of the DA's decision that Ms. Walker was not criminally culpable, the exclusion of § 41.005 is inapplicable in this case.  Of the numerous factors that should be considered in deciding whether, and how much, to award as exemplary damages, in this particular case the "extent to which" TASER's misconduct "offends a public sense of justice and propriety" is particularly acute.  § 41.011(a)(5), Tex. Civ. Prac. & Rem Code.

89.     Officer Taylor seeks both prejudgment and post-judgment interest as allowed by law, reasonable attorney's fees under the DTPA, all costs of court, and judgment for all other relief, both in law and in equity, to which Officer Taylor may be entitled.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Karen Taylor prays that upon final trial and hearing hereof, that she recover from Defendant TASER International, Inc., now known as Axon Enterprise, Inc., actual, statutorily enhanced, and/or exemplary/punitive damages in accordance with the evidence, that she recover reasonable attorney's fees under the DTPA, costs of court herein expended, that she recover both pre-judgment and post-judgment interest to which she is justly entitled under the law, and for such other and further relief, both general and special, both in law and in equity, to which she may be justly entitled.

Respectfully submitted,

**VICKERY & SHEPHERD, LLP**

*/s/ Arnold Anderson Vickery*
Arnold Anderson Vickery
Texas Bar No. 20571800
Fred H. Shepherd
Texas Bar No. 24033056
10000 Memorial Dr., Suite 750
Houston, TX  77024-3485
Telephone:  713-526-1100
Facsimile:  713-523-5939
Email:  andy@justiceseekers.com
Email:  fred@justiceseekers.com
***Attorneys for Plaintiff***

BELL ROSE P.C.

/s/ Chris Bell
Chris Bell
Texas Bar No. 00783631
10000 Memorial Dr., Suite 750
Houston, TX  77024-3485
Telephone:  713-300-5158
Facsimile:  713-583-5524
Email:  Chris@ChrisBellLaw.com
*Attorneys for Plaintiff*

THE BRISCOE GROUP PLLC

/s/ Billy J. Briscoe
Billy J. Briscoe
Texas Bar No. 24028926
1980 Post Oak Blvd., 15th Floor
Houston, TX  77056
Telephone:  713-752-2600
Facsimile:  832-201-9950
Email:  bbriscoe@thebriscoelawfirm.com
*Attorneys for Plaintiff*

Certificate of Service

I hereby certify that on July 27, 2017, Plaintiff's First Amended Complaint was electronically filed with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

Roger L McCleary, Esq.
Angela Webster, Esq.
PARSONS MCENTIRE MCCLEARY & CLARK, PLLC
One Riverway, Suite 1800
Houston, TX 77056

Pamela B. Petersen, Esq.
Amy L. Nguyen, Esq.
AXON ENTERPRISE, INC.
17800 N. 85th Street
Scottsdale, AZ 85255

/s/ Arnold Anderson Vickery
Arnold Anderson Vickery