IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KAREN TAYLOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-673 |
| | § | |
| TASER INTERNATIONAL, INC., | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Pending before the court[1] are: (1) Plaintiff's Motion to Exclude Opinion Testimony that the TASER X2 is as Effective as the TASER X26 (Doc. 70); (2) Defendant's Motion to Exclude Certain Experts' Opinions (Doc. 74); and Defendant's Motion for Summary Judgment (Doc. 76).[2] The court has considered the motions, the responses, the replies, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion to exclude and **GRANTS IN PART AND DENIES IN PART** Defendant's motion to exclude. The court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment.

### I. Case Background

Plaintiff filed this products-liability action against a

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. <u>See</u> Doc. 105, Ord. Dated May 29, 2018.

[2] Also pending is Defendant's redacted version of the motion for summary judgment (Doc. 77), which is identical in substance to the sealed motion for summary judgment. Therefore, in accordance with the ruling expressed herein, that motion is **GRANTED IN PART AND DENIED IN PART.**

company that supplied the Houston Police Department ("HPD") with Conducted Electrical Weapons ("CEWs"),[3] alleging that Plaintiff suffered injuries in an assault by a suspect when the CEW Plaintiff was using failed to subdue the individual.[4]

## A. **Factual History**

The parties submitted statements of facts and filed responses and replies thereto. The court relies on all of those briefs to craft the following sections on undisputed facts and disputed facts and inferences.

### 1. **Undisputed Facts**

From 2003 to 2014, Defendant produced the TASER X26E CEW ("X26E").[5] In September 2013, Defendant and the City of Houston entered into a contract for the sale of the newer TASER X2 CEWs ("X2s") for the city's police force over a five-year period at a purchase price of more than $8 million.[6] The underlying email quote included a statement on warranties with the following heading

---

[3] CEWs are known by several other names: Electronic Control Devices, Conducted Energy Devices, and Electronic Control Weapons. See Doc. 71, Def.'s Statement of Facts in Support of Mot. for Summ. J. & Daubert Mot. ("Def.'s Statement of Facts") p. 4 n.3.

[4] See Doc. 1, Pl.'s Orig. Compl.

[5] See Doc. 71, Def.'s Statement of Facts ¶ 22; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts in Support of Mot. for Summ. J. & Daubert Mot. ("Pl.'s Resp. to Def.'s Statement of Facts") p. 7.
The record evidence refers to the X26E and the TASER X26 CEW ("X26"). It is unclear whether those are one and the same model. To avoid confusion, where the record specifically refers to the X26E, the court does so as well.

[6] See Doc. 71, Def.'s Statement of Facts ¶ 8; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 4.

in bold typeface as here: "**Warranty; Exclusions and Limitations; Release**," which stated in part, "TASER specifically disclaims any and all statutory or implied warranties, including without limitation, warranties of merchantability, design fitness for a particular purpose . . . ."[7] An attachment to the email included a similar warranty in bold typeface that disclaimed the implied warranties of merchantability and fitness for a particular purpose, among others.[8]

That same month, Defendant shipped the first 2,188 X2s and related accessories, valued at $2.8 million.[9] Plaintiff received an individually boxed X2 from that shipment; it is the CEW at issue in this case.[10]

The box in which Plaintiff's X2 was packaged also contained Defendant's "Warranty, Limitations and Release - Law Enforcement Products," which read in bold typeface:

> **TASER specifically disclaims any and all statutory or implied warranties, including without limitation, warranties of merchantability, design, fitness for a particular purpose, arising from a course of dealing, usage or trade practice, warranties against hidden or latent defects, and warranties against patent**

---

[7]    Doc. 71, Def.'s Statement of Facts ¶ 11; <u>see also</u> Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 4.

[8]    <u>See</u> Doc. 71, Def.'s Statement of Facts ¶ 11; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 4.

[9]    <u>See</u> Doc. 71, Def.'s Statement of Facts ¶ 8; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 4.

[10]    <u>See</u> Doc. 71, Def.'s Statement of Facts ¶¶ 8, 24; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts pp. 4, 7.

**infringement. If statutory or implied warranties cannot be lawfully disclaimed, then all such warranties are limited to the duration of the express warranty described above and limited by the other provisions contained in this warranty document.**[11]

According to its specifications, the X2's electrical output consisted of the following:

(1) pulse duration: 50-125 microseconds . . .[;] (2) peak loaded voltage: 840-1440 volts[;] (3) pulse rate: 19 ± 1 pulses per second[;] (4) full pulse charge: 63 ± 9 microcoulombs . . .[;] and [(5)] current: 1.2 milliamperes.[12]

The X2 was "designed to use electrical impulses to cause stimulation of both the sensory and motor nerves ["called Neuro-Muscular Incapacitation" ("NMI")] to temporarily incapacitate a target."[13] The discharge cycle upon pulling and releasing the trigger the first time lasts five seconds.[14] The X2 has options of re-energizing the deployed probes for another five seconds or deploying of a second pair of probes.[15] The X2 is also equipped with "data download capabilities that record the date, time, and

---

[11]     Doc. 71, Def.'s Statement of Facts ¶ 10; <u>see also</u> Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 4.

[12]     Doc. 71, Def.'s Statement of Facts ¶ 12; <u>see also</u> Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 4.

[13]     Doc. 71, Def.'s Statement of Facts ¶ 14; <u>see also</u> Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 5.

[14]     <u>See</u> Doc. 71, Def.'s Statement of Facts ¶ 18; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 5.

[15]     <u>See</u> Doc. 71, Def.'s Statement of Facts ¶ 18; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 5.

duration of each CEW activation."[16]

In May 2008, Plaintiff was hired by HPD as a patrol officer.[17] While on duty on October 8, 2015, Plaintiff was in a physical fight with Florence Walker ("Walker").[18] During the encounter, Plaintiff physically struggled with Walker and, due to their proximity, was unable to deploy her X2 or her baton at that time.[19] In an attempt to create space between them, Plaintiff struck Walker in the upper torso, but Walker grabbed Plaintiff and tried to bite her.[20] Plaintiff attempted another hand strike to Walker's upper torso, but Walker ducked, and Plaintiff struck Walker "solidly on top of her forehead," causing Plaintiff "a large amount of [hand] pain and discomfort."[21]

Walker fell, and Plaintiff armed her X2.[22] As Walker stood up and lunged toward Plaintiff, Plaintiff deployed the X2 into the

---

[16]     Doc. 71, Def.'s Statement of Facts ¶ 19; see also Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 5.

[17]     Doc. 71, Def.'s Statement of Facts ¶ 1.

[18]     See Doc. 88, Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Statement of Facts") ¶ 1; Doc. 102, Def.'s Resp. & Objs. to Pl.'s Statement of Undisputed Material Facts ("Def.'s Resp. to Pl.'s Statement of Facts"), Resp. to ¶ 1.

[19]     See Doc. 71, Def.'s Statement of Facts ¶ 33; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[20]     See Doc. 71, Def.'s Statement of Facts ¶ 33; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[21]     Doc. 71, Def.'s Statement of Facts ¶ 34 (quoting Doc. 72-1, Ex. 1 to Def.'s Statement of Facts, Pl.'s Incident Report p. 2); see also Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[22]     See Doc. 71, Def.'s Statement of Facts ¶ 34; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

center of Walker's torso.[23]  Walker "became rigid and fell over onto the concrete" and hit her face causing her mouth to bleed.[24] Plaintiff believed, at the time, that this deployment was effective for the full five-second cycle.[25]  Walker stood up and shouted that she was going to kill Plaintiff, after which Plaintiff deployed her X2 a second time, hitting Walker "center mass."[26]  Walker "almost immediately" pulled out the probes.[27]  Plaintiff unsuccessfully attempted to re-energize the deployed probes.[28]

Thereafter, Walker encountered a witness, Raymond Davis ("Davis").  The details of the encounter are disputed and discussed in the next section.  Plaintiff chased Walker who, after encountering Davis, ran into the bathroom at the store and barricaded herself inside.[29]  When other officers arrived, they

---

[23]    See Doc. 71, Def.'s Statement of Facts ¶ 34; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[24]    Doc. 71, Def.'s Statement of Facts ¶ 34 (quoting Doc. 72-1, Ex. 1 to Def.'s Statement of Facts, Pl.'s Incident Report p. 2); see also Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[25]    See Doc. 71, Def.'s Statement of Facts ¶ 35; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[26]    See Doc. 71, Def.'s Statement of Facts ¶ 37 (quoting Doc. 72-1, Ex. 1 to Def.'s Statement of Facts, Pl.'s Incident Report p. 2); see also Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[27]    Doc. 71, Def.'s Statement of Facts ¶ 37 (quoting Doc. 72-2, Ex. 2 to Def.'s Statement of Facts, Dep. of Pl. p. 150); see also Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[28]    See Doc. 71, Def.'s Statement of Facts ¶ 38; see also Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

[29]    See Doc. 71, Def.'s Statement of Facts ¶ 38; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7.

eventually were able to secure Walker.[30]

At the scene, Plaintiff was treated only for a hand injury and did not indicate in her incident report that she suffered a back injury.[31] Two weeks later, Plaintiff also complained of a back injury and sought treatment.[32]

### 2. Disputed Facts and Inferences

In at least three material areas, as outlined by the parties in their statements of facts, the facts or the inferences reasonably drawn from those facts are in dispute: (1) comparative effectiveness between the X2 and other models; (2) the timeline vis-à-vis Plaintiff's deployment of the X2; and (3) the cause of Plaintiff's back injury. The court recounts those disputes.

One officer on the scene stated that Plaintiff told him that her X2 did not work, and another officer on the scene said that Plaintiff was upset about the X2's performance.[33] Defendant disputes that these were accurate portrayals of the officers'

---

[30]    See Doc. 71, Def.'s Statement of Facts ¶ 38; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7; Doc. 88, Pl.'s Statement of Facts ¶¶ 21, 29; Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶¶ 21, 29.

[31]    See Doc. 71, Def.'s Statement of Facts ¶ 39; Doc. 72-1, Ex. 1 to Def.'s Statement of Facts, Pl.'s Incident Report; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7; Doc. 88, Pl.'s Statement of Facts ¶ 2; Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 2.

[32]    See Doc. 71, Def.'s Statement of Facts ¶¶ 39, 53; Doc. 83, Pl.'s Resp. to Def.'s Statement of Facts p. 7; Doc. 88, Pl.'s Statement of Facts ¶ 2; Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 2.

[33]    See Doc. 88, Pl.'s Statement of Facts ¶¶ 11-12.

statements.[34]

The main phase charge of a CEW is "the single most important electrical parameter" and is important in determining its ability to cause NMI.[35] The earlier model X26E had a main phase charge of approximately 100 microcoulombs.[36] Although Defendant does not dispute the accuracy of the TASER X26 CEW's ("X26") main phase charge; Defendant states that charge is not the only significant factor and that the X26 and other older-generation CEWs had a different waveform than the X2 and lacked charge metering.[37]

Defendant also markets a consumer CEW, the TASER Pulse, that has a charge of ninety microcoulombs and uses the same type of circuit as the X2.[38] Defendant disputes that the X2 and the Pulse have the same circuits and waveforms.[39]

Plaintiff offers a timeline of events based on the HPD data download report from the X2, which indicated that Plaintiff's first trigger pull occurred at 12:46 p.m.[40] Harmonizing this time stamp

---

[34] See Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶¶ 11-12.

[35] Doc. 88, Pl.'s Statement of Facts ¶ 37 (quoting Doc. 88-8, Ex. H to Pl.'s Statement of Facts, Dep. of Bryan Chiles pp. 15-16); see also id. ¶ 31.

[36] See Doc. 88, Pl.'s Statement of Facts ¶ 31.

[37] See Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 31.

[38] See Doc. 88, Pl.'s Statement of Facts ¶ 35.

[39] See Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 35.

[40] See Doc. 88, Pl.'s Statement of Facts ¶ 13.

with the time of her call for assistance at 12:51 while she was heard physically engaging Walker, Plaintiff raises an inference that she and Walker fought after the first deployment of the X2.[41] Defendant, however, produced evidence that the weapon's internal clock was running five minutes and eleven seconds slow, meaning that Plaintiff's call for help while struggling with Walker occurred nearly contemporaneously with her first trigger pull.[42]

Davis, the witness, reported that after Walker fell and hit her head, she jumped up immediately and ran to him.[43] Davis said that Walker hugged him for a "long time" before Plaintiff pulled Walker away.[44] Defendant disputes that the witness said Walker jumped up *immediately* and disputes any insinuation that the first deployment did not incapacitate Walker for the full five seconds.[45] Defendant also disputes any suggestion that fighting occurred after the first deployment because, in addition to saying that Plaintiff pulled Walker away, Davis also said that he was "positive" no fighting occurred after Walker jumped back up.[46] Defendant also

---

[41] See Doc. 88, Pl.'s Statement of Facts ¶¶ 13, 16, 20; Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶¶ 13, 16, 20.

[42] See Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 13.

[43] See Doc. 88, Pl.'s Statement of Facts ¶¶ 7-8.

[44] Doc. 88-4, Ex. D to Pl.'s Statement of Facts, Dep. of Raymond Davis p. 47; see also Doc. 88, Pl.'s Statement of Facts ¶ 9.

[45] See Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶¶ 7-8.

[46] Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 9.

points to Plaintiff's incident report that did not describe any physical contact with Walker after the first deployment, but Plaintiff has since recalled the incident differently.[47]

Although Plaintiff did not initially claim a back injury, Sergeant Richard Reyna ("Reyna") testified that he was "aware during [his] time as a Houston police officer where someone ha[d] been injured in a course of a fight and [did] not realize the full extent of their injuries on the . . . day of the fight."[48] Defendant disputes that Reyna's deposition response could be understood to mean that such a phenomenon was "common," a word Plaintiff interjected into the deposition testimony.[49] Officer Darrell Williams ("Williams") testified, in response to the question whether he recalled Plaintiff mentioning a back injury at the time of the altercation, that "Police are typically more concerned about knives and guns; and, you know, if you're alive and you're not stabbed or shot, you know, it's a good day."[50] Defendant disputes Plaintiff's embellishment of Williams's statement that he was "not surprised" Plaintiff did not report her back injury on the

---

[47]    See Doc. 71, Def.'s Statement of Facts ¶ 41.

[48]    Doc. 88-2, Ex. B to Pl.'s Statement of Facts, Dep. of Reyna p. 85; see also Doc. 88, Pl.'s Statement of Facts ¶ 4.

[49]    Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 4; see also Doc. 88, Pl.'s Statement of Facts ¶ 4.

[50]    Doc. 88, Pl.'s Statement of Facts ¶ 4 (quoting Doc. 83-7, Ex. G to Pl.'s Resp. to Def.'s Statement of Facts, Dep. of Williams p. 24).

day of the fight with Walker.[51]

A physician who performed a physical examination of Plaintiff pursuant to the Federal Rules of Civil Procedure 35 testified, that Plaintiff's back injury was "what's called a lumbar radiculopathy" that, hypothetically, could have resulted from a rotational injury caused by a physical fight with another person.[52]   Defendant disputes that this amounts to a causation opinion that Plaintiff's back injury resulted from her altercation with Walker.[53]

## B.  **Procedural History**

On March 2, 2017, Plaintiff filed this lawsuit, asserting claims of negligence in the manufacturing of the X2, strict tort liability in the designing and marketing of the X2, breaches of the express warranty and the implied warranties of merchantability and suitability related to the X2's effectiveness, and violations of the Texas Deceptive Trade Practices Act[54] ("DTPA") through false, deceptive, and misleading representations and failure to disclose

---

[51]     Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 5; see also Doc. 88, Pl.'s Statement of Facts ¶¶ 5, 27; Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 27.

[52]     Doc. 87-15, Ex. O to Pl.'s Opp. to Def.'s Consolidated Daubert Mot. to Exclude Certain Pl.'s Experts & Ops. ("Pl.'s Resp. to Def.'s Mot. to Exclude"), Dep. of Andrew Kant ("Kant") pp. 23-24; see also Doc. 88, Pl.'s Statement of Facts ¶ 3.

[53]     See Doc. 102, Def.'s Resp. to Pl.'s Statement of Facts, Resp. to ¶ 3.

[54]     Tex. Bus. & Com. Code §§ 17.41-17.63.

material information.[55]  Plaintiff sought compensatory damages for physical pain, mental anguish, lost wages, loss of earning capacity, physical impairment, medical-care expenses, out-of-pocket economic loss, enhanced statutory damages, costs, attorneys' fees, and pre- and post-judgment interest.[56]

On July 27, 2017, Plaintiff timely amended her complaint.[57] Plaintiff significantly rewrote and expounded the factual allegations; however, she added no additional causes of action.[58] In addition to the relief requested in her original complaint, Plaintiff sought exemplary damages.[59]

On August 17, 2017, Defendant filed a motion to strike portions of Plaintiff's amended complaint, arguing that they contained "immaterial, inflammatory and superfluous statements that have nothing to do with Plaintiff's claims, and are solely intended to improperly cast TASER in a derogatory light and try this case in the media."[60]  Defendant simultaneously filed an answer and counterclaim to the amended complaint.[61]  On October 31, 2017, the

---

[55]     See Doc. 1, Pl.'s Orig. Compl. pp. 6-8; Doc. 24, Pl.'s 1st Am. Compl. pp. 17-24.

[56]     See Doc. 1, Pl.'s Orig. Compl. pp. 8-9.

[57]     See Doc. 24, Pl.'s 1st Am. Compl.

[58]     See id.

[59]     See id. pp. 24-26.

[60]     Doc. 32, Def.'s Mot. to Strike Portions of Pl.'s 1st Am. Compl. p. 1.

[61]     See Doc. 33, Def.'s Ans. & Countercl. to 1st Am. Compl.

court denied Defendant's motion to strike, and, on November 17, 2017, Defendant filed an amended answer and counterclaim.[62]  In the amended answer, Defendant asserted forty-one defenses and affirmative defenses.[63]  Defendant's "counterclaim" consisted solely of a request for the award of "court costs and reasonable and necessary attorneys' fees" under the provisions of the DTPA, based on the assertion that Plaintiff's claims "are groundless in fact or law, brought in bad faith, or brought for the purpose of harassment."[64]

In April 2018, following a period of discovery and the exchange of reports by the designated experts, each party filed a motion to exclude certain expert testimony of the other side.[65]  Defendant also filed a motion for summary judgment.[66]  All of these motions are fully briefed.

## II.  Motions to Exclude

Plaintiff filed a motion to exclude the opinion expressed by three of Defendant's experts that the X2 is as effective as the X26

---

[62]    See Doc. 44, Ord. Dated Oct. 31, 2017; Doc. 47, Def.'s Ans. & Countercl. to 1st Am. Compl.

[63]    See Doc. 47, Def.'s Ans. & Countercl. to 1st Am. Compl. pp. 41-47.

[64]    Id. p. 47.

[65]    See Doc. 70, Pl.'s Mot. to Exclude Op. Test. that the Taser X2 is as Effective as the Taser X26 ("Pl.'s Mot. to Exclude"); Doc. 74, Def.'s Mot. to Exclude Certain Experts' Ops. ("Def.'s Mot. to Exclude").

[66]    See Doc. 76, Def.'s Mot. for Summ. J.

at stopping suspects.[67] Defendant filed a motion to exclude certain opinions by three of Plaintiff's experts, specifically, opinions regarding the X2, medical and electrical engineering conclusions about its effectiveness, and medical causation related to Plaintiff's back injury.

## A.  Legal Standard

Under the Federal Rules of Evidence and related case law, an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "[T]o qualify as an expert, the witness must have such knowledge or experience in his field or calling to make it appear that his opinion or inference will probably aid the trier in his search for truth." United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004)(internal quotation and alteration marks omitted)(quoting United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992)).

If an opinion is based solely or primarily on experience, it "must be grounded in an accepted body of learning or experience in the expert's field." Fed. R. Evid. 702, advisory committee's note, 2000 Amends.  The witness must connect the experience to the conclusion offered, must explain why the experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts.  Id.  Although an

---

[67]     To the extent Plaintiff is asking the court to disallow lay testimony on this issue, the court declines to entertain that request at this time and will address it at the pretrial conference if filed in the form of a motion in limine.

expert need not be highly qualified to testify on a given topic, his testimony on subjects in which he is not qualified must be excluded.  <u>Huss v. Gayden</u>, 571 F.3d 442, 452 (5th Cir. 2009).

The expert's testimony must be both relevant and reliable. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999); <u>Smith v. Goodyear Tire & Rubber Co.</u>, 495 F.3d 224, 227 (5th Cir. 2007); <u>see also</u> Fed. R. Evid. 702 & advisory committee's note, 2000 Amends. The burden of establishing this predicate for the expert's testimony falls on the party producing the expert.  <u>Mathis v. Exxon Corp.</u>, 302 F.3d 448, 459-60 (5th Cir. 2002).  The trial court has the responsibility of determining whether that party has met its burden.  Fed. R. Evid. 104(a); <u>Mathis</u>, 302 F.3d at 459-60.  The trial judge has "wide latitude in determining the admissibility of expert testimony;" yet, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, advisory committee's note, 2000 Amends.; <u>Wilson v. Woods</u>, 163 F.3d 935, 936-37 (5th Cir. 1999)(quoting <u>Watkins v. Telsmith, Inc.</u>, 121 F.3d 984, 988 (5th Cir. 1997)).

To be relevant, the testimony must assist "the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The Federal Rules of Evidence define relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Reliability hinges on the sufficiency of the facts or data upon which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case. See Fed. R. Evid. 702. In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993), the U.S. Supreme Court outlined several reliability factors for scientific testimony: (1) whether the theory or technique has been tested; (2) whether it has been subjected to publication and peer review; (3) whether it has a known or potential rate of error; and (4) whether it is generally accepted or has gained only minimal support within the relevant community. When the testimony is not scientific, these factors may apply even though the focus is on experience and personal knowledge. See Kumho Tire Co., 526 U.S. at 151. The trial judge must make certain that the expert applied "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

The court's gate-keeping responsibility is not intended to infringe upon the adversarial process. Cf. Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004)(quoting United States v. 14.38 Acres of

Land, More or Less Situated in Leflore Cty., Miss., 80 F.3d 1074, 1077 (5th Cir. 1996))("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration."); 14.38 Acres of Land, More or Less Situated in Leflore Cty. Miss., 80 F.3d at 1079 ("The perceived flaws in the testimony of [the] experts are matters properly to be tested in the crucible of adversarial proceedings; they are not the basis for truncating that process.").

**B.  Plaintiff's Motion to Exclude**

Plaintiff's motion seeks to limit the testimony of three of Defendant's designated experts: (1) Jeffrey Ho ("Ho"), a medical doctor who serves as Defendant's Medical Director and who developed the methodology and performed the testing on both the X26 and the X2; (2) Magne Nerheim ("Nerheim"), an electrical engineer who serves as Defendant's Vice President of Research and Technical Fellow; and (3) Dorin Panescu ("Panescu"), a biomedical scientist and expert in cardiac devices.  Plaintiff "only seeks to exclude the opinions of both Dr. Ho and Dr. Nerheim that the X2 and the X26 have equivalent (or better) effectiveness, and the similar, more ambiguously expressed opinions of Panescu . . . regarding any related effectiveness between the X2 and previous models."[68] Plaintiff explicitly does not question the qualifications of any of

---

[68]    Doc. 70, Pl.'s Mot. to Exclude p. 3.

the three to offer expert testimony in his field of expertise.

The court understands that the effectiveness of the X2 is a fact of consequence in this case. Without a doubt, the expert testimony of all three of these experts is relevant in that their opinions would help the jury determine the effectiveness of the X2 in comparison to the X26.[69] Plaintiff's challenges go to the reliability of Defendant's methodology for and adequacy of the testing of the X2. Because Ho developed the "human motivation testing" methodology and performed the testing on the X2 and the other two experts relied on that testing, Plaintiff argues, these experts' opinions "devolve merely to the ipse dixit of Dr. Ho."[70]

The court finds that Defendant has met its burden of demonstrating that Ho's methodology is reliable because it has been tested, has been published and peer reviewed, has statistical significance, and has been accepted by the University of Minnesota's School of Medicine. Based on that ruling, the reliability of the opinions of Nerheim and Panescu are not tainted by any purported reliance on Ho's methodology.

As to Panescu, "Plaintiff additionally requests that [he] be prohibited from referencing [American National Standards Institute, the Crane Power Line Standards Organization ("ANSI/CPLSO")] 17 in his testimony unless and/or until the [c]ourt is satisfied that

---

[69] Plaintiff does not challenge the prior testing used by Ho in testing the X26.

[70] Doc. 70, Pl.'s Mot. to Exclude p. 7.

this standard is a legitimate, publicly available, safety standard that was in effect when the X2 in issue in this case was designed and manufactured."[71]   Plaintiff argues that Panescu's opinions concerning whether the X2 electrical output met ANSI/CPLSO 17 are not reliable because Panescu played a role in creating ANSI/CPLSO 17.  Framing its concern as TASER's "working behind the scenes to create a new 'standard' for determining the effectiveness of CEWs," Plaintiff suggests a nefarious purpose without any evidence of improper action.[72]

Defendant has also countered Plaintiff's challenge to the legitimacy of ANSI/CPLSO 17.  As a reviewer for the ANSI/CPLSO, Panescu reviewed the standard prior to its adoption.  According to Panescu, ANSI/CPLSO 17 is a safety standard applicable to high voltage CEWs used by law enforcement agencies.  Panescu cited to the CPLSO website, which provides information about the standard, including the process by which standards are developed and general information about the background, research, and subject matter of the ANSI/CPLSO 17.  By all appearances, ANSI/CPLSO 17 is a legitimate, publicly available (albeit not free), safety standard. Panescu cited to the 2017 version of the standard; if the standard was created after the X2 was designed and manufactured, Plaintiff can test its applicability to the X2 on cross-examination.  If

---

[71]    Id. p. 19.

[72]    Id. p. 8.

Defendant has not turned over a copy of the ANSI/CPLSO 17, it must do so or show cause why it is unable to do so.

Based on Plaintiff's motion to exclude, the court is confident that Plaintiff's counsel is more than capable of revealing any flaws or shortcomings of these experts' reports through cross-examination and the presentation of contrary evidence at trial. None of Plaintiff's concerns, however, warrants the exclusion of any expert opinions as each report meets the minimum threshold for admissibility under <u>Daubert</u> and its progeny.

## C.  **Defendant's Motion to Exclude**

Defendant's motion seeks to limit the testimony of Mark Jones ("Jones"), a political science professor, and Michael Leonesio ("Leonesio"), a former police officer with "hands-on professional experience using, testing, and forensically analyzing [electroshock weapon ("ESW")] performance."[73] Defendant also seeks to strike the opinions of Cameron Jackson ("Jackson"), Plaintiff's treating chiropractor.

Defendant contends that Jones does not have the training, knowledge, or experience to offer "medical/physiological or electrical engineering opinions on the effectiveness of the TASER X2 CEW, the central design issue in this case," including opinions drawn from a spreadsheet listing CEW deployments by HPD personnel between January 2011 and April 2016 that HPD identified as

---

[73]     Doc. 87, Pl.'s Resp. to Def.'s Mot. to Exclude p. 12.

unsuccessful.[74] Defendant also seeks to prevent Jones from offering societal impact opinions as to what "*could* result *if* (1) the X2 is less effective (which he has no opinion on)[] and *if* (2) *someday* officers lose confidence in the X2 (which he has seen no evidence of yet)."[75]

Plaintiff counters that Defendant is "attack[ing] Jones' qualifications to render opinions he does not intend to render in this case, and thereby attempts to seed doubt as to the reliability of the opinions that he *will* render, all of which are squarely within his professional expertise and the product of his unique experience with evaluating the City of Houston's use of TASERs."[76] Plaintiff represents that it does not intend to ask Jones whether the X2 has less stopping power than the X26 because "Jones is neither a medical doctor nor an engineer and has no particular expertise in testing ESWs or measuring their output."[77] On the other hand, Plaintiff does intend to solicit Jones's opinion on "exactly what can happen in this very community if the X2 at issue is underpowered."[78]

The court agrees with the parties that Jones is not qualified

---

[74]    Doc. 74, Def.'s Mot. to Exclude p. 8; <u>see also</u> <u>id.</u> pp. 10-12.

[75]    <u>Id.</u> p. 12.

[76]    Doc. 87, Pl.'s Resp. to Def.'s Mot. to Exclude p. 5.

[77]    <u>Id.</u> p. 6.

[78]    <u>Id.</u> p. 5.

to offer opinions on any scientific aspect of the X2, including its effectiveness and/or stopping power. Jones's experience with CEWs is limited to his participation as a researcher in a 2008 audit of X26E deployments between December 2004 and June 2007 with the purpose of examining police behavior and the impact of CEWs. Defendant concedes that Jones is qualified to discuss these research findings and, therefore, does not seek to exclude that portion of his testimony.

The problem area is Jones's testimony as to public policy/social utility "concerning the potential effect of arming police officers with less powerful TASERs."[79] As Plaintiff acknowledges, Jones employed that same type of analysis as used in the 2008 audit but assumed a less effective weapon. His conclusions do not pass <u>Daubert</u> review for multiple reasons. First, he does not have the extensive data that was available to him for the 2008 audit on this "less effective weapon." The spreadsheet identifying deployments that HPD labeled unsuccessful did not include nearly the information to which Jones had access in 2008. Additionally, the document itself is of limited value because it lacks basic information such as what model of CEW was used and how the deployment was unsuccessful. Because of the lack of information, reliable conclusions cannot be drawn and the spreadsheet also must be excluded from evidence.

---

[79]    <u>Id.</u> p. 9.

Second, Jones's opinions are irrelevant if not tied to the X2. Jones is not qualified to make the determination that the X2 is less effective than the X26E, and he does not have the factual support for that conclusion. Third, his opinion on the societal impact of a less effective CEW will not help the jury reach a decision in this particular product-liability case because no claim is based on Plaintiff's or any other officer's confidence in the X2. Fourth, much of this portion of his testimony is not the substance of expert opinion. The jury is capable of reaching logical, common-sense conclusions about what could happen if police officers were armed with less effective CEWs and lost confidence in their use. Jones's societal-impact opinions are excluded.

Regarding Leonesio's testimony, Defendant does not seek to exclude opinions on Plaintiff's use of force or opinions on the testing performed on Plaintiff's X2 but does seek to exclude all of Leonesio's opinions that rely on expertise in medical and/or electrical engineering. Without a doubt, Leonesio is not qualified to offer opinions in those areas of expertise. Plaintiff agrees. The difference lies in what the two sides view as falling in that prohibited area of testimony. Although Leonesio has years of experience using and testing CEWs, he cannot serve as an expert on ultimately scientific topics, such as incapacitation performance, and he cannot formulate his own scientific opinions based on the medical or engineering work or opinions of others. If Plaintiff

wants to rely on the work or opinions of others, she will need to find another way to get that into evidence. The court recognizes that the line between the subjects on which Leonesio may opine and those he may not is less than clear-cut and may require more specific rulings pretrial or from the bench.

Finally, Defendant moves to exclude the opinions of Jackson as improperly disclosed and unreliable. As Plaintiff's treating physician, who was not retained or specially employed to offer expert testimony, he was not required to provide a written report. See Fed. R. Civ. P. 26(2)(B). The court finds that Plaintiff complied with the disclosure requirements. Additionally, the court will allow Jackson to testify as to causation regarding Plaintiff's back injury based on his treatment of Plaintiff. Defendant may raise all of its concerns in cross-examination.

### III. Motion for Summary Judgment

Defendant's motion for summary judgment seeks judgment in its favor on all of Plaintiff's claims.

Before addressing the merits of Defendant's dispositive motion, the court turns to the parties' objections to each other's statement of facts. Except for including the date on which HPD employed Plaintiff, the court did not rely on any of the evidence to which either party objected as irrelevant or hearsay. All objections to evidence are **OVERRULED**. Plaintiff's objection to Defendant's sealing and redacting its filings is **OVERRULED**.

Additionally, Defendant seeks a spoliation instruction related to Plaintiff's self-serving statements about post-deployment fighting that contradict her incident report and other prior statements. Plaintiff failed to disclose a second witness, a tow-truck driver who intervened to assist Plaintiff and who could provide testimony on this topic. Plaintiff explained that she did so "to do him a solid."[80] According to Defendant, Plaintiff contacted the driver when she was contemplating legal action, and the driver refused to provide an affidavit. Defendant contends that her failure to disclose him in this case "arguably constitutes perjury" but "certainly sanctionable discovery misconduct."[81]

The spoliation doctrine allows a jury to draw an inference "that a party who intentionally destroy[ed] important evidence in bad faith did so because the contents of those documents were unfavorable to that party." Whitt v. Stephens Cty., 529 F.3d 278, 284 (5th Cir. 2008)(quoting Russell v. Univ. of Tex., 234 F. App'x 195, 207 (5th Cir. 2007)(unpublished)). In order for the court to permit a spoliation inference, the moving party must show bad faith or bad conduct in relation to the destruction of evidence. Condrey v. SunTrust Bank of Ga., 431 F.3d 191, 203 (5th Cir. 2005).

Despite the accusation, Defendant fails to point the court to actual evidence of bad faith or bad conduct, as opposed to

---

[80]     Doc. 71, Def.'s Statement of Facts ¶ 45 (quoting Doc. 72-22, Ex. 21 to Def.'s Statement of Facts, Pl.'s Facebook Posts p. 3730).

[81]     Doc. 76, Def.'s Mot. for Summ. J. p. 17.

suspicious motivations and appearances of impropriety.  Plaintiff's

actions were perhaps bad judgment and improper under HPD policies,

but they occurred prior to the filing of this lawsuit and do not

manifest bad faith or bad conduct.  At the point that Plaintiff

contemplated legal action, she attempted to include the tow-truck

driver as a witness when she asked him to provide an affidavit.

Absent evidence of bad faith, an adverse inference or any other

sanction for spoliation is not warranted.  The court finds summary

judgment in Defendant's favor an inappropriate sanction in light of

the evidence as a whole.  Plaintiff's self-serving statements are

not the only evidence of post-deployment fighting.

## A.  <u>Legal Standard</u>

Summary judgment is warranted when the evidence reveals that

no genuine dispute exists regarding any material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986);

<u>Stauffer v. Gearhart</u>, 741 F.3d 574, 581 (5th Cir. 2014).  A material

fact is a fact that is identified by applicable substantive law as

critical to the outcome of the suit.  <u>Anderson v. Liberty Lobby,

Inc.</u>, 477 U.S. 242, 248 (1986); <u>Ameristar Jet Charter, Inc. v.

Signal Composites, Inc.</u>, 271 F.3d 624, 626 (5th Cir. 2001).  To be

genuine, the dispute regarding a material fact must be supported by

evidence such that a reasonable jury could resolve the issue in

favor of either party.  See <u>Royal v. CCC & R Tres Arboles, L.L.C.,</u>

736 F.3d 396, 400 (5th Cir. 2013)(quoting <u>Anderson</u>, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir. 1992). If the movant carries its burden, the nonmovant may not rest on the allegations or denials in the pleading but must respond with evidence showing a genuine factual dispute. <u>Stauffer</u>, 741 F.3d at 581 (citing <u>Hathaway v. Bazany</u>, 507 F.3d 312, 319 (5th Cir. 2007)). The court must accept all of the nonmovant's uncontroverted evidence as true and draw all justifiable inferences in her favor. <u>Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.</u>, 759 F.3d 498, 505 (5th Cir. 2014)(quoting <u>Anderson</u>, 477 U.S. at 255).

## B.  <u>Discussion</u>

With regard to Plaintiff's products-liability claims of negligence and strict tort liability, Defendant argues that Plaintiff has failed to produce evidence supporting her position on the "only two things this [c]ourt needs to decide:" (1) whether the X2 was underpowered as designed; and (2) whether Plaintiff and Walker engaged in any post-deployment "fighting to support a causal

link between the X2 CEW and Plaintiff's alleged back injury."[82] Additionally, Defendant argues that it disclaimed all implied warranties and that, among other arguments, Plaintiff produced no evidence that she relied on any express warranty. Regarding the DTPA claim, Defendant contends that the transaction in issue was statutorily exempt.

### 1. Negligence and Strict Tort Liability

The only challenges to these claims are factual ones. Restating Defendant's arguments, the court must determine whether Plaintiff has produced evidence that the X2 was underpowered/ineffective, particularly in comparison with the X26 and/or the Pulse, and that its ineffectiveness caused Plaintiff's back injury. As the parties agree that these factual issues are material, the court's duty in this regard is to determine whether Plaintiff has produced sufficient evidence to raise a genuine dispute. The court is bound by legal precedent to draw all justifiable inferences in Plaintiff's favor. As perhaps foreshadowed by the court's identification of disputed facts *and inferences* in a prior section of this memorandum, the court determines that Plaintiff's evidence raises genuine disputes as to both of these factual issues, albeit by the slimmest of margins.

Regarding the X2's effectiveness, Plaintiff primarily focuses on evidence of the comparative full pulse charges. The evidence

---

[82]    Doc. 76, Def.'s Mot. for Summ. J. p. 10.

supports her position that the full pulse charge is lower than the electrical output by either the X26 or the Pulse. Defendant concedes the full pulse charge is one factor in determining power and effectiveness, but produces evidence that it is not the only relevant measurement.

As to the X2's performance on that particular day, the evidence is conflicting on how long Walker was incapacitated. Plaintiff points to witness testimony that Walker got up immediately after deployment of the X2. Defendant's evidence suggests that Walker was incapacitated for the full five-second cycle. The court is not at liberty to make that determination.

The timeline vis-à-vis deployment of the X2 and the fighting is one aspect of causation. If no fighting occurred after deployment, Plaintiff's back injury was not caused by the (in)effectiveness of the X2. Plaintiff's theory of the timeline of the first trigger pull and physical engagement with Walker is supported by the data download from the X26. Defendant contends that the X26 needed to be synchronized to the correct time before creating a timeline. The court cannot simply take Defendant at its word that the X26's internal clock does not keep accurate time. Moreover, Davis's testimony does not provide clarification in that he recalled that Walker jumped up and ran to him after the first deployment had caused her to fall and hit her face and, subsequently, Plaintiff physically pulled Walker off of him. Thus,

even though he reported that no fighting occurred after Walker ran to him, he did report that Plaintiff engaged Walker physically after deployment of the X2. In light of the evidence of conflicting timelines, the jury must decide which is accurate.

The other aspect of causation is whether the contact with Walker caused Plaintiff's back injury. Plaintiff's expert and the Federal Rules of Civil Procedure 35 physician both stated that such an injury could result from a physical altercation such as that between Plaintiff and Walker. But neither said so definitively. This evidence may be thin, but the court cannot resolve that factual dispute either.

This is not a case where the plaintiff failed to produce any evidence; rather, this is a case where the amount, weight, and credibility of the evidence is at issue. The court acknowledges that the evidence in this case is plagued by Plaintiff's purportedly poor recollection and changes in her account of the incident, however these are credibility issues. The jury will have to listen to all of the evidence and decide whom to believe. Here, the justifiable inferences could lead a reasonable jury to the conclusion that Plaintiff and Walker engaged in hand-to-hand combat after Plaintiff deployed the X2 and that Plaintiff's back injury resulted from that fight.

Plaintiff has met her summary judgment burden.

## 2. Breach of Warranties

Reliance is an element of a claim for breach of an express warranty. See Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 686 n.23 (Tex. 2002)(citing Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 436 (Tex. 1997), superseded by statute on other grounds. Defendant challenges Plaintiff's evidence of reliance. In response, Plaintiff does not address Defendant's arguments or point to evidence of reliance. The court is left to assume Plaintiff abandoned that claim. Regardless, absent evidence of reliance, Defendant is entitled to summary judgment in its favor.

The implied warranties of merchantability and fitness may be disclaimed. See Tex. Bus. & Com. Code § 2.316(b). To disclaim an implied warranty of merchantability, the language must mention merchantability and, if written, must be conspicuous. Id. Disclaimer of an implied warranty of fitness is effective if in writing and conspicuous. See id. The court decides as a matter of law whether the disclaimer is conspicuous. See Womco, Inc. v. Navistar Int'l Corp., 84 S.W.3d 272, 279 (Tex. App.—Tyler 2002, no pet.)(citing Cate v. Dover Corp., 790 S.W.2d 559, 560 (Tex. 1990). Disclaimer of an implied warranty is an affirmative defense. MAN Engines & Components, Inc. v. Shows, 434 S.W.3d 132, 136 (Tex. 2014).

In this case, Defendant provided HPD with a copy of its limited warranty with the quote and also placed a copy of the

limited warranty in each X2 box. It is undisputed that Plaintiff received the X2 assigned to her in the box with the warranty. In both places, the limited warranty was in bold typeface, making it conspicuous.[83] The limited warranty specifically disclaimed implied warranties of merchantability and fitness. These presentations of Defendant's disclaimer of the implied warranties of merchantability and fitness met the requirements of Texas law. Therefore, Defendant successfully established its affirmative defense of disclaimer as a matter of law.

### 3. DTPA

The DTPA exempts from its coverage any "cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000." Tex. Bus. & Com. Code § 17.49(g).

It is undisputed that the contract between Defendant and HPD for the sale of the X2's far exceeded that amount. Plaintiff responds with largely irrelevant generalizations about the purpose of the DTPA in protecting consumers from deceptive business practices. Plaintiff argues that the contract was between the City of Houston and Defendant, not Plaintiff and Defendant. The court does not find that argument helpful to Plaintiff's cause because it calls into question the already questionable assertion that

---

[83]    Without citation to legal authority, Plaintiff argues that Defendant points to no evidence that she ever saw the limited warranty and, thus, cannot prove that it was conspicuous to *her*. The court finds no legal support for this argument.

Plaintiff is a DTPA consumer. <u>See</u> Tex. Bus. & Com. Code § 17.45(4)(defining "consumer" to mean "an individual, partnership, corporation, this state, or a subdivision or agency of this state who *seeks or acquires by purchase or lease*, any goods or services")(emphasis added).

Relying on <u>Neese v. Lyon</u>, 479 S.W.3d 368 (Tex. App.—Dallas 2015, no pet.), Plaintiff goes further, arguing that even if "the [c]ourt must attribute the cost of the X2 to the end consumer, the total unit price for [Plaintiff's] individual X2 is $950."[84] This court disagrees. The <u>Neese</u> case involved individuals who sued attorneys and a private investigator for engaging in barratry by soliciting them as clients for a personal injury lawsuit. <u>See id.</u> at 374. Although all individuals were plaintiffs in one lawsuit, they were recruited separately and engaged the law firm's representation separately. <u>Id.</u> Collectively, the total consideration paid for representation exceeded $500,000, but, individually, each plaintiff's consideration for representation was less than $500,000. <u>Id.</u> at 392. The court stated, without elaborating on its findings, "The text of § 17.49(g) supports the . . . argument that the $500,000 cap must be applied on an individual-consumer basis." <u>Id.</u>

That case is not factually analogous, and that court's legal justification therein is limited although it appears to rely on a

---

[84]   Doc. 89, Pl.'s Resp. to Def.'s Mot. for Summ. J. p. 23.

finding that the transactions, in other words, the representation agreements were not sufficiently related to combine the consideration for purposes of the DTPA exemption.

In contrast, the purchase of numerous X2s by HPD pursuant to one contract that far exceeded the $500,000 limit clearly fits within the exemption's reach. Accordingly, Defendant met its burden of proof that it is entitled to summary judgment in its favor on Plaintiff's DTPA claim.

## IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion to exclude and **GRANTS IN PART AND DENIES IN PART** Defendant's motion to exclude. The court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 29th day of March, 2019.

_____
U.S. MAGISTRATE JUDGE